UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| CASSANDRA INGLE, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | Case No. 1:16-cv-00053-SPM |
|  | ) |  |
|  | ) |  |
| NANCY A. BERRYHILL,[1] | ) |  |
| Acting Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**MEMORANDUM OPINION**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, denying the application of Plaintiff Cassandra Ingle ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 7). Because I find that the decision involved legal error and was not supported by substantial evidence, I will reverse the Commissioner's denial of Plaintiff's application and remand the case for further proceedings.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I. FACTUAL BACKGROUND

At the hearings before the ALJ on August 22, 2013, and March 13, 2014, Plaintiff testified as follows. She has two to three seizures a month, with residual symptoms of dizziness, weakness, and wanting to sleep all the time. (Tr. 99). She stated that after she has a seizure, she usually sleeps for roughly 24 hours, and she has memory problems. (Tr. 46). She suffers from bipolar disorder and anxiety attacks and has mood swings. (Tr. 100). She has visual and auditory hallucinations. (Tr. 32-33). She gets migraine headaches at least ten times a month. (Tr. 38, 92). She has neck and back pain "all the time," arthritis in her hands, numbness, and tingling. (Tr. 43-45). She stated that she can only be up and about for fifteen minutes before taking a break. (Tr. 42, 95). She can sit for roughly 30 minutes at a time, if she is able to shift positions. (Tr. 42).

The medical evidence dated after Plaintiff's alleged disability onset date shows that she sought emergency room treatment for seizures on several occasions (Tr. 661-62, 868, 842-43, 704, 812, 777, 766, 756, 908-09, 981); that she sought treatment for anxiety and panic attacks (Tr. 801-02, 833-34); that she sought treatment from a neurologist for her seizures (Tr. 676, 929-30); that she sought treatment for migraine headaches (Tr. 693-94, 676, 929-30); that she sought treatment for panic attacks and anxiety (Tr. 802, 833-34, 945-47, 957-60, 949-51); that she was assigned Global Assessment of Functioning ("GAF") scores ranging from 36 to 55[2] (Tr. 947, 960, 951);

---

[2] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoid friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* 32. A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional

and that she had severe, multi-level degenerative disc disease in the cervical spine (Tr. 920). Her diagnoses included pseudo-seizure, epilepsy, and other seizure-related disorders (Tr. 584, 662, 676-77, 708, 779, 814, 870, 908, 980); back pain with possible degenerative disc disease (Tr. 930-31); migraine headache (Tr. 597, 693), panic attack/anxiety disorder (Tr. 802, 834); bipolar disorder (Tr. 947, 957-60); psychotic disorder NOS (Tr. 951); and polysubstance dependence (Tr. 951, 960).

On September 23, 2013, Plaintiff's treating neurologist, Dr. Shahid Choudhary, noted that Plaintiff had a positive straight leg raise test; cervical, thoracic, and lumbar pain with touch and palpitation, and an anxious and nervous appearance. (Tr. 930). Dr. Choudhary opined that Plaintiff could lift and carry up to 10 pounds continuously and 20 pounds occasionally; sit for two hours at a time and for up to six hours of an eight-hour workday; stand for one hour at a time and for up to two hours of an eight-hour workday; walk for 30 minutes at a time and for up to one hour of an eight-hour workday; do occasional pushing and pulling; do frequent reaching, handling, fingering, feeling, and operation of foot controls; never climb ladders, scaffolds, stairs, and ramps; occasionally balance, stoop, kneel, crouch, and crawl; never have exposure to unprotected heights or moving mechanical parts; never operate a motor vehicle; have occasional exposure to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold or heat, and vibrations; and have moderate exposure to noise. (Tr. 938-42).

---

rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 32. A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

On January 24, 2014, psychiatrist Dr. Salazar evaluated Plaintiff as part of her treatment and found that her mood was anxious, her thought process was tangential and at times incoherent, she had visual and auditory hallucinations, and her judgment and insight were poor; other observations were generally normal. (Tr. 949-50). Dr. Salazar assigned a GAF of 45 (indicating serious symptoms or impairments), and his diagnoses included psychotic disorder NOS, polysubstance abuse, and R/O borderline intellectual functioning. (Tr. 951).

On August 13, 2014, Plaintiff underwent a psychological consultative examination by Amber Richardson, Ph.D. (Tr. 1010). Dr. Richardson noted that Plaintiff described severe mood swings, panic attacks when she goes to the grocery store, continuous nightmares, difficulty sleeping, and seeing and hearing spirits. (Tr. 1010). Dr. Richardson noted that Plaintiff reported experiencing seizures five or six times a month. (Tr. 1011). Plaintiff reported a history of marijuana, crack cocaine, and methamphetamine use, but stated that she had not used methamphetamines in a few months. (Tr. 1011). Dr. Richardson noted that Plaintiff had poor boundaries, appeared anxious and depressed, had thought content that was paranoid at times, and appeared to be experiencing visual hallucinations during the examination. (Tr. 1012). She found that Plaintiff "appears to experience perceptual disturbances on a frequent basis regardless of any issues with mood related symptoms" and that she "experiences moderate impairment in her ability to sustain attention and persistence in tasks and interact socially." (Tr. 1012). Dr. Richardson opined that due to Plaintiff's paranoid ideation and internal stimuli, Plaintiff was moderately limited in her ability to make judgments on complex work-related decisions; interact appropriately with the public, supervisors, and coworkers; and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 1014-15). She also stated that Plaintiff would be

limited regarding her "attention abilities as she may be distracted by perceptual disturbances." (Tr. 1015).

Mark Farber, M.D., testified at the hearing before the ALJ that Plaintiff's impairments include a profuse bulging disc at C-4-5-6 that might be causing her headaches; degenerative disc disease of all the cervical discs; herniated discs at L4-5, and degenerative changes of the lumbar and thoracic spine. (Tr. 104-106). He also testified that he was not sure that seizures were really what Plaintiff was having, and that she "might have some sort of pseudoseizure." (Tr. 106).

John Pollard, M.D., reviewed Plaintiff's medical records and testified at the hearing that Plaintiff's problems included seizures, headaches, back and neck pain, chronic obstructive pulmonary disease, and bipolar disorder. (Tr. 52-53, 55-56). Dr. Pollard stated that Plaintiff appeared to have some true seizures and some pseudoseizures. (Tr. 59-62). He also stated that based on the record, there was no way to judge how frequently she was having true seizures. (Tr. 61). He stated that she would not meet or equal the listing applicable to seizures, which requires seizures to be epileptic. (Tr. 60-62). Dr. Pollard testified that based on the frequency of the seizures he saw within the record, Plaintiff could possibly be expected to miss two to three days of work per month. (Tr. 62).

Psychological expert Thomas England, Ph.D., reviewed Plaintiff's medical records and testified at the hearing. Dr. England testified that it appeared to him that Plaintiff's seizures were likely the result of a somatoform disorder, but that it would be helpful to have a diagnosis from Plaintiff's treating physician. (Tr. 65, 72). He also testified that substance abuse was a complicating factor in assessing Plaintiff's impairments. (Tr. 69-72, 74).

## II. PROCEDURAL BACKGROUND

On September 27, 2011, Plaintiff applied for DIB and SSI, alleging that she had been unable to work since April 28, 2011. (Tr. 317-23, 324-30). Her application was initially denied. (Tr.186-90). On December 16, 2011, she filed a Request for Hearing by Administrative Law Judge ("ALJ"). (Tr. 191-92). On September 25, 2014, following two hearings, the ALJ found Plaintiff was not under a "disability" as defined in the Act. (Tr. 12-22). On November 7, 2014, Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council. (Tr. 6-8). On January 19, 2016, the Appeals Council declined to review the case. (Tr. 1-5). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## III. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.*

At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

### IV. THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff had not engaged in substantial gainful activity since April 28, 2011, the alleged onset date; that Plaintiff had the severe impairments of a seizure disorder, degenerative disc disease of the cervical and lumbar spines, headaches, chronic obstructive pulmonary disease (COPD), a psychotic disorder not otherwise specified, and polysubstance abuse; and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 14-15). The ALJ found that Plaintiff had the RFC to perform light work, except that she must avoid ladders, ropes and scaffolds; must avoid work around unprotected heights or dangerous machinery; must avoid operation of motor vehicles; must avoid concentrated exposure to temperature extremes; could only occasionally climb ramps or stairs, stoop, bend, crouch, or crawl; and was limited to simple and/or repetitive jobs that do not require close interaction with the public or teamwork such as with coworkers. (Tr. 16). The ALJ found that Plaintiff was unable to perform any of her past relevant work. (Tr. 20).

However, relying on the testimony of a vocational expert, the ALJ found that Plaintiff would be able to perform occupations including office cleaner and small parts assembler. (Tr. 21-22). The ALJ concluded that Plaintiff had not been under a disability, as defined in the Act, from April 28, 2011 through the date of his decision. (Tr. 22).

V. **DISCUSSION**

Plaintiff challenges the ALJ's decision on two grounds: (1) that the ALJ erred by discounting the opinion of Dr. Pollard regarding the effects of Plaintiff's seizure impairment and by failing to develop the record with regard to Plaintiff's seizure impairment; and (2) that ALJ's decision is not supported by substantial evidence, because neither the RFC nor the hypothetical question posed to the vocational expert accounted for Plaintiff's moderate limitations in concentration, persistence, and pace or for her difficulties in responding appropriately to usual work situations and to changes in a routine work setting.

A. **Standard for Judicial Review**

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of

testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's Evaluation of Dr. Pollard's Opinion and the ALJ's Development of the Record Regarding Plaintiff's Seizures

The Court first considers Plaintiff's argument that the ALJ erred by discounting the opinion of Dr. Pollard regarding Plaintiff's seizure impairment and by failing to develop the record with regard to Plaintiff's seizure impairment. At the hearing, Dr. Pollard testified that based on the frequency of the seizures he saw within the record, Plaintiff could possibly be expected to miss two to three days of work per month. (Tr. 62). The vocational expert stated that if a hypothetical individual with Plaintiff's limitations regularly missed two or more days of work each month, she could not perform any work. (Tr. 81).

In discussing the frequency of Plaintiff's seizures, the ALJ stated:

> The conclusion of Dr. Pollard that the claimant's frequency of seizures could be expected to result in work absenteeism 2 days per month is not accepted as there is no medical evidence of seizure activity on EEG or CT scan of the head. The claimant's seizures are typically associated with lack of medical compliance regarding prescribed medication and directed abstinence from substance abuse for headaches, CT scans of the head are repeatedly negative. Therefore, if the claimant is abstinent from substance abuse and compliant with directed medical therapy, it is presumed that she will not have seizure-like activity resulting in work absenteeism 2 days per month.

(Tr. 20). The ALJ also mentioned later in his decision that "seizure-like activity appears to be associated with noncompliance with medical therapy and continued substance abuse." *Id*. at 20.

It is clear from the above that the ALJ's determination that Plaintiff would not be expected to miss work two or more days a month due to her seizures, and his decision to discount Dr. Pollard's opinion regarding Plaintiff's seizures, were based at least in significant part on the ALJ's belief that some of Plaintiff's seizures or related symptoms were caused by her substance abuse. After review of the record and the ALJ's decision, it does not appear that the ALJ properly followed Eighth Circuit law and Social Security Administration regulations for making a disability determination when substance abuse is a factor.

Under the 1996 amendments to the Social Security Act, an individual is not considered disabled "if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); *see also Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003). In *Brueggemann*, the Eighth Circuit outlined in detail the procedures the ALJ must follow, under the relevant regulations, in analyzing substance-related disability claims. *Id.* at 693-95 (discussing 20 C.F.R. § 404.1535); *see also* 20 C.F.R. § 416.935. First, the ALJ must "determine whether [the claimant] is disabled. The ALJ must reach this determination initially . . . using the standard five-step approach described in 20 C.F.R. § 404.1520 without segregating out any effects that might be due to substance use disorders." *Id.* at 694. This disability determination must be made "without deductions for the assumed effects of substance disorders." *Id.* If all of the claimant's limitations, "including the effects of substance abuse disorders," show disability, "then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent." *Id.* at 694-95. "Even though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other." *Id.* at 695. "Only after the ALJ has made an initial determination 1) that [the claimant] is

disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction, may he then reach a conclusion on whether [the claimant's] substance use disorders are a contributing factor material to the determination of disability." *Id.* If the ALJ cannot determine whether the substance use disorders are a material contributing factor, the ALJ must award benefits. *Id. See also Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010) (describing the procedure for assessing the effect of substance use on disability claims).

Courts have found that a failure to follow the procedures prescribed by the regulations may constitute reversible legal error. *See Brueggemann*, 348 F.3d 689, 693-95 (8th Cir. 2003) (finding reversible legal error where ALJ gave little weight to a physician opinion because of a claimant's alcohol use and did not conduct the analysis required by the regulations; finding the error was not harmless because there was reliable evidence of disability independent of alcohol abuse); *Patterson v. Colvin*, No. 2:15-CV-75-JMB, 2016 WL 7242157, at *7 (E.D. Mo. Dec. 15, 2016) (finding reversible error where "[t]he ALJ did not first determine whether Plaintiff was disabled with the effects of alcoholism included," but rather "addresses, and, to an extent, discounts the effects of alcohol in a piecemeal fashion"; noting that "the legal error in failing to acknowledge and follow the regulations concerning alcohol dependence deprives the ALJ's decision of substantial evidentiary support"). However, courts may find the legal error harmless where it is clear from the record that the plaintiff's substance abuse caused his or her impairments. *See, e.g.*, *Watkins v. Astrue*, No. CIV. 09-5064-RHB, 2010 WL 3360428, at *4 (D.S.D. Aug. 23, 2010) (finding ALJ's failure to analyze plaintiff's substance abuse under the relevant regulation harmless because "there is no evidence in the record that would indicate that [the plaintiff] suffers from any

impairment or combination of impairments that, independent of his alcoholism, render him disabled.").

The Court finds that the ALJ in this case erred by not conducting the analysis required by *Brueggemann* and the relevant regulations. It is undisputed that Plaintiff had polysubstance abuse disorder. (Tr. 14). It is also clear from the ALJ's decision that he viewed Plaintiff's polysubstance abuse disorder as a significant factor affecting her symptoms, including her seizures. However, the ALJ did not conduct the analysis set forth in *Brueggemann* and the regulations, but instead discounted her particular symptoms based on the effects of substance use as he was making his RFC finding. This was legal error.

The Court cannot say that the ALJ's legal error was harmless in this case. Although the record suggests that substance abuse may have contributed to Plaintiff's seizures and other symptoms, there is also significant evidence of seizures or pseudoseizures that are not obviously associated with substance abuse. On the current record, it is not clear what limitations would remain absent Plaintiff's substance abuse, and whether those limitations would be disabling.

The Court acknowledges that the ALJ offered some other reasons for his finding with regard to the frequency of Plaintiff's seizures—the normal CT and EEG findings and the evidence of noncompliance with recommended treatment. However, it is not clear from the record or the ALJ's analysis whether those reasons, standing apart from the ALJ's findings with regard to substance use, would have supported the ALJ's conclusions with regard to Plaintiffs' seizures. In addition, it is unclear how the ALJ determined that Plaintiff's normal EEGs and CT scans would support the ALJ's finding that her seizures or pseudoseizures were less frequent (or would cause her to leave work less frequently) than Dr. Pollard found they would. Plaintiff's neurologist, Dr. Choudhary, noted that "normal EEG does not preclude the possibility of seizures." (Tr. 691). It is

not apparent to the court why the ALJ found that normal EEGs and CT scans would suggest that Plaintiff's seizures (or pseudoseizures) were not as frequent as she and her doctors indicated they were.

For all of the above reasons, remand is required. On remand, the ALJ should conduct the analysis required by the relevant regulations.

The Court will also briefly address Plaintiff's argument that the ALJ has failed to adequately develop the record with regard to Plaintiff's seizures. Plaintiff argues that the ALJ should have done more to develop the record with regard to the possibility that some of Plaintiff's seizure-like episodes were caused by somatoform disorder.

It is well-settled that "the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), and *Landess v. Weinberger*, 490 F.2d 1187, 1188 (8th Cir. 1974)). The ALJ's duty extends even to cases where the claimant is represented by an attorney at the administrative hearing. *Id.* (citing *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983)). "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision." *Nader v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994). However, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Id. Accord Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001). The duty to develop the record "is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (citing *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis."

*Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citing *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994).

After review of the record, the Court cannot say that the ALJ failed to develop the record in this case by not developing additional evidence related to somatoform disorder. A diagnosis of somatoform disorder was not mentioned in Plaintiff's extensive treatment notes. At the hearing, psychological expert Dr. England testified that after reviewing the record, it seemed likely that Plaintiff had a somatoform disorder causing her seizures, and that he "would really like to have in this case the primary [t]reating psychiatric physician, Dr. Salazar, to evaluate that." (Tr. 65). He testified that if Dr. Salazar was not responsive, a one-time consultative examination might be of some help. (Tr. 75). The ALJ gave Plaintiff's attorney time to contact Dr. Salazar to find out whether he would do a review, and Plaintiff's counsel stated that he would follow up with Dr. Salazar. (Tr. 78-80). The ALJ also noted that if Dr. Salazar was uncooperative, he did not know of any psychiatrists that would do a consultative examination at the ALJ's request, and that he thought it was probably "almost impossible that [he] could get a psychiatrist to do one." (Tr. 75, 78). Plaintiff's attorney ultimately wrote a letter to the ALJ stating that Dr. Salazar had not returned his calls and had informed Plaintiff that he did not feel he had a sufficient history at this point to opine on her diagnoses. (Tr. 424). The ALJ did refer Plaintiff to a consulting psychologist, Dr. Richardson, though her report did not address the cause of Plaintiff's seizures. (Tr. 1010-12).

It is unclear what more the ALJ could have done here to develop the record with respect to a possible somatoform disorder. It is also unclear what the ALJ could do if the Court were to remand the case for him to further develop the record on this point. Moreover, in light of the absence of discussion of somatoform disorder in Plaintiff's treatment notes, it was not unreasonable for the ALJ to decide that he could make a determination about Plaintiff's symptoms

15

and limitations without developing additional evidence of that disorder. On these facts, the Court finds no failure to develop the record that would independently warrant remand. However, the Court makes no finding with regard to whether the record has been fully developed on the question of what effect substance use had on Plaintiff's seizures or other symptoms. On remand, the ALJ should ensure that he has a full and fair record on that point. *See Brueggemann*, 348 F.3d at 695 ("Even though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other.").

### C. Plaintiff's Limitations in Attention, Concentration, Persistence, Pace, and Ability to Deal With Work Situations

Plaintiff's second argument is that ALJ's decision is not supported by substantial evidence, because neither the RFC nor the hypothetical question posed to the vocational expert accounted for Plaintiff's limitations in attention, concentration, persistence, pace, the ability to deal with work situations, and the ability to deal with routine changes in the work setting. Plaintiff argues that in light of the record evidence—in particular the opinion of Dr. Richardson, which the ALJ indicated that he accepted, the ALJ should have included additional limitations in the RFC and in the hypothetical question posed to the vocational expert.

The Court first notes that that there is no clear rule in the case law concerning whether limitations similar to a limitation to "simple and/or repetitive" jobs adequately account for difficulties in concentration, persistence, or pace; it is a fact-specific question. *Compare, e.g.*, *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996) (holding that a limitation to "simple jobs" in the hypothetical question did not adequately account for moderate deficiencies in concentration, persistence, or pace reflected in the record), and *Denney v. Colvin*, No. 4:14-CV-879-MDH, 2016 WL 901695, at *2 (holding that a limitation to "simple, routine, repetitive unskilled work tasks" with only occasional interaction with coworkers did not adequately account for the plaintiff's "at

16

least 'moderate' difficulties" in the ability to maintain attention and concentration for extended periods of time; stating, "[c]ourts have held that limitations to simple, routine, repetitive and/or unskilled work do not sufficiently account for the moderate limitations in concentration, persistence, or pace . . ."), *with Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (holding that a limitation to "simple, routine, repetitive work" adequately accounted for moderate limitations in concentration, persistence, or pace, where a functional capacity assessment performed by a doctor indicated that the claimant could sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity ), and *Faint v. Colvin*, 26 F. Supp. 3d 896, 911-12 (E.D. Mo. 2014) (distinguishing *Newton* and finding that on the facts before the court, the evidence did not show that plaintiff's moderate deficiencies in concentration, persistence, and pace imposed limitations that would preclude the performance of simple, unskilled work).

After review of the specific facts of this case, it appears to the Court that the record supports a finding of significant limitations in attention, persistence, concentration, and/or pace, and in ability to deal with work situations and changes. However, it is unclear what findings the ALJ made with regard to Plaintiff's limitations in these areas. The only medical source who examined and evaluated Plaintiff and offered a specific opinion about these issues was Dr. Richardson, an examining clinical psychologist. Dr. Richardson noted that Plaintiff had paranoid thought content; that she appeared to be experiencing visual hallucinations during her examination; that she had poor boundaries; and that her judgment and insight were poor. (Tr. 1012). She opined that Plaintiff "appears to experience perceptual disturbances on a frequent basis regardless of any issues with mood related symptoms" and that she "experiences moderate impairment in her ability to sustain attention and persistence in tasks and interact socially." (Tr. 1012). Dr. Richardson also opined

17

that due to Plaintiff's paranoid ideation and internal stimuli, Plaintiff had (among other limitations) moderate limitations in her ability to respond appropriately to usual work situations and changes in a work setting, as well as a limitation in her "attention abilities as she may be distracted by perceptual disturbances." (Tr. 1015). The notes from Plaintiff's treating psychiatrist, Dr. Salazar, are consistent with Dr. Richardson's findings. Although Dr. Salazar did not offer an opinion about Plaintiff's work-related mental limitations, he noted that she had visual and auditory hallucinations—the symptoms that underlay Dr. Richardson's opinions about attention and persistence—as well as a tangential and at times incoherent thought process, and poor judgment and insight. (Tr. 949-50). Dr. Salazar also assigned Plaintiff a GAF of 45 (indicating "serious" symptoms or "serious impairment in social, occupational, or school functioning"), and his diagnoses included psychotic disorder NOS. (Tr. 951). That GAF score would appear to indicate mental limitations more significant than those reflected in the RFC, and it is unclear whether the ALJ considered it.[3]

The ALJ did not explain why he was discounting Dr. Richardson's findings with regard to Plaintiff's attention and persistence or her ability to respond to usual work situations or changes in a work setting; indeed, the ALJ stated in his RFC analysis that he accepted the limitations in Dr. Richardson's opinion regarding Plaintiff's limitations in social functioning and concentration, persistence, and pace as being consistent with the diagnoses and clinical findings of Dr. Salazar. (Tr. 20). The ALJ also did not identify other substantial evidence in the record supporting a conclusion that Plaintiff did not have significant limitations in these areas.

---

[3] The ALJ stated that "[t]he Global Assessment of Functioning scores as would suggest mental disability are from nonmedical sources and not accepted due to lack of sufficient medical expertise." (Tr. 20). The ALJ was apparently referring to GAF scores in the record rather than to the GAF score assigned by Dr. Salazar, who was Plaintiff's treating psychiatrist and thus does have the appropriate medical expertise to assign a GAF score.

18

The most persuasive evidence supporting the ALJ's decision not to include these mental limitations in the RFC is found in the Commissioner's brief, in which the Commissioner suggests that the hallucinations, paranoia, and racing thoughts that formed the basis for Dr. Richardson's opinions were the result of Plaintiff's substance abuse and thus could not form the basis for a finding of disability. *See* Def.'s Resp., at p. 8. However, the ALJ did not make such a finding. Moreover, as discussed above, to the extent that the ALJ's disability determination was based on discounting certain symptoms because they were caused by Plaintiff's substance abuse, the ALJ erred by not conducting the analysis that is required by regulations and Eighth Circuit case law in cases involving substance abuse. *See Brueggemann*, 348 F.3d at 693-95.

The Court also finds that on the facts of this case, Plaintiff's limitations in attention, concentration, persistence, pace, and ability to respond to work situations and changes in the workplace do not appear to be adequately addressed by a limitation to "simple and/or repetitive work" or a limitation on close interaction with the public or co-workers. The record indicates that Plaintiff's attention and persistence problems, and her problems in dealing with work situations, were related to visual and auditory hallucinations brought on by schizophrenia or psychotic disorder. If, as Dr. Richardson found, Plaintiff is experiencing "perceptual disturbances on a frequent basis" based on visual and auditory hallucinations, it is unclear why that would not interfere with her ability to pay attention and persist in even simple and/or repetitive work, performed without close interactions with others. Moreover, the attention and persistence problems are compounded by Plaintiff's apparent difficulties in her ability to deal with work situations.

In sum, based on the current record, the Court cannot say that there is substantial evidence to support the ALJ's decision not to include additional mental limitations in the RFC or hypothetical question posed to the VE that address Plaintiff's limitations in attention,

concentration, persistence, pace, and ability to deal with work situations. In light of the uncertainty regarding whether Plaintiff has limitations that were not included in the RFC or in the question posed to the vocational expert, remand is appropriate. *See Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011) ("[W]hen a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence.") (internal quotation marks omitted). On remand, the ALJ should provide clarification regarding the weight he gives to the opinions of Dr. Richardson; should make clear his findings about what limitations, if any, Plaintiff has in attention, concentration, persistence, pace, and the ability to deal with work situations and changes in work situations (and the evidence for those findings); and should ensure that the RFC and the hypothetical question posed to the vocational expert includes any such limitations. To the extent that the ALJ discounts certain symptoms in his analysis because they are caused by drug use, he should do so only after conducting the analysis dictated by *Brueggemann* and the relevant regulations.

## VI. CONCLUSION

For the reasons set forth above, the Court finds that the decision of the Commissioner involved a legal error and is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under 42 U.S.C. § 1383(c)(3) and Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of September, 2017.